## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) ) NO. CV96-0122-N-EJL ) NO. CV91-0342-N-EJL |
| Plaintiff, | ) ) |
| v. | ) ) |
| ASARCO INCORPORATED, et al., | ) **MEMORANDUM** ) **ORDER** ) |
| Defendants. | ) ) |
| _____ | ) ) |
| AND CONSOLIDATED CASE. | ) ) |
| _____ | ) |

Pending before the Court in the above-entitled matter are Defendants' Motion for Partial Summary Judgment (Docket No.1365) and related motions to strike certain declarations and/or expert reports.  Asarco filed the original motion and Hecla joined in the motion in their response to the motion.  Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

**Defendant's Motion for Partial Summary Judgment (Docket No. 1365)**

1. Background Information

Defendants maintain in the motion that partial summary judgment is proper on

the location of the damages that Defendants should be held responsible for.  Defendants maintain that the Plaintiffs failed to prove that any of the mine tailings outside the 100 year floodplain in the drainages these Defendants operated are the mine tailings for which the Defendants are responsible.  Defendants claim their liability for damages should be limited to damages for response and remediation costs only if such costs are within the boundaries of the 100 year floodplain of the drainages they operated. Defendants claim res judicata or collateral estoppel if the Plaintiffs try to prove the location of the damages outside the 100 year floodplain in Phase 2 trial.  Plaintiffs object to the motion and argue the issue of damages has not been litigated and the Defendants are liable for the Court determined percentages (Asarco 22% and Hecla 31%) for all mining damages within the Coeur d'Alene Basin (the "Basin").

2. Standard of Review

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. See, Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986).  If the non-moving party fails to make such a showing on any

MEMORANDUM ORDER - Page 2

essential element, "there can be no `genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.[1]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation.  An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (quoting First Nat'l Bank v. Cities Serv. Co. Inc., 391 U.S. 253, 289 (1968)).  The Ninth Circuit cases are in accord.  See, e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund, 882 F.2d 371 (9th Cir. 1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

---

[1]  See also, Rule 56(e) which provides, in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

MEMORANDUM ORDER - Page 3

Id. at 374 (citation omitted).

Of course, when applying the above standard, the Court must view all of the evidence in a light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hughes v. United States, 953 F.2d 531, 541 (9th Cir. 1992).

       3. Analysis

       A.  Res judicata, collateral estoppel and estoppel.

In Phase 1, the Court determined the drainages in which Asarco and Hecla owned or operated mines and/or mills and the percent of liability for mining tailings in those drainages based on production.  The Court found Asarco was 22% liable for commingled mine tailings and Hecla was 31% liable for co-mingled mine tailings.  One of the purposes of the Phase 1 trial was to determine if Asarco and Hecla were owners and/or operators for purposes of liability under CERCLA.  The Court did not make specific findings on where the hazardous substances have come to be located although the Court heard testimony that the majority of the mine tailings were dumped into the adjacent waterways.

Defendants argue that any claim by the USA that Defendants have to pay for a percentage of total response costs and natural resource damages outside the flood plains of the drainages wherein they had operations is barred by the doctrines of *res judicata*, collateral estoppel and estoppel.  The Court finds none of these legal doctrines are applicable to this issue.

"*Res judicata*, or claim preclusion, provides that a final judgment on the merits of an action precludes the parties from relitigating all issues connected with the action that

MEMORANDUM ORDER - Page 4

were or could have been raised in that action."  Rein v. Providian Fin. Corp., 252 F.3d

1095, 1098 (9th Cir. 2001).  *Res judicata* has four elements:

> (1) the parties are identical or in privity; (2) the judgment on the prior
> action was rendered by a court of competent jurisdiction; (3) the prior
> action was concluded to a final judgment on the merits; and (4) the same
> claim or cause of action was involved in both suits."

Id.

The main flaw with the argument for *res judicata* is that there has been no final

judgment on the merits of Defendants' current argument of limited damages to certain

flood plains.  Therefore, *res judicata* cannot apply.

Collateral estoppel, or issue preclusion,  has three elements:

> (1) the issue at stake must be identical to the one alleged in the prior
> litigation; (2) the issue must have been actually litigated [by the party
> against who preclusion is asserted] in prior litigation; and (3) the
> determination of the issue in the prior litigation must have been critical
> and necessary part of the judgment in the earlier action.

Town of North Bonneville v. Callaway, 10 F.3d 1505, 1508 (9th Cir. 1993) (citing Clark

v. Bear Stearns & Co., 966 F.2d 1318, 1320 (9th Cir. 1992).

The flaw with Defendants' theory of collateral estoppel is that the present claim

of limiting damages to hazardous substances within certain flood plains was never

disposed of by prior litigation and has not been addressed by the Court in this case.  The

Defendants take the Court's prior rulings out of context to support their premise.  The

Phase 1 trial in this matter was to determine which of the named defendants were owners

or operators for purposes of CERCLA liability.  The USA admitted Defendants did not

have operations in certain drainages and could not be held liable as owners or operators

in those drainages and the Court accepted those admissions.  After the Phase 1 trial, the

MEMORANDUM ORDER - Page 5

Court issued findings of fact and conclusions of law regarding the drainages in which Asarco and/or Hecla were owners or operators. The Court did not determine in Phase 1 where the hazardous substances have come to be located as a matter of law. The discussion of releases in Phase 1 was to establish owner and/or operator liability for the releases, but the issue of determining the "facility" and where the releases have come to be located within the Basin was not a legal issue before the Court, so no finding was made on that issue.

Furthermore, the Court did not decide the issue in its June 2000 Order (Docket No. 864). The Court stated on pp. 4-5 of such Order:

> In the facts presented to the Court, the parties agree Asarco should not have liability for tributaries in which it did not conduct mining activities and therefore, did not release hazardous substances into such tributaries. Hence, the Court finds that Asarco is correct in its general argument that it should not be held responsible for damages in tributaries in which it did not conduct any mining activities or releases. However, the Court also agrees with USA that there is a genuine issue of material fact as to whether or not Asarco conducted mining activities in certain identified drainages.[2] As to the drainages in footnote 3, the Court will have to determine at trial whether or not Asarco conducted mining activities on or near these tributaries that resulted in the release of hazardous substances.
>
> The Court also agrees with the USA that there is a genuine issue of material fact regarding whether or not Asarco's releases in certain identified tributaries[3] may have damaged the flood plains of the South Fork and the Coeur d'Alene Rivers. To the extent that the USA and Tribe can show that Asarco damaged the rivers and that such damage in turn damaged the rivers' flood plains, Asarco could possibly be liable for damage up a tributary to the extent that tributary is within a flood plain of

---

[2]The USA claims that Asarco has been involved in mining activities in the following identified tributaries of the South Fork involved in this motion: Grouse Gulch, Silver Creek, and Little Pine Creek.

[3]Identified in Asarco's memorandum (Docket No. 723), statement of material facts (Docket No. 724) and the Declaration of Christopher Pfahl (Docket No. 725).

MEMORANDUM ORDER - Page 6

the aforementioned rivers.  CERCLA defines the term "facility" very broadly and includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).  CWA creates liability for an "owner or operator" of a facility from which hazardous substance was discharged. 33 U.S.C. § 1321(f0(3) and (4).  Because hazardous substances could have "come to be located" within the flood plains from other mining activities conducted by Asarco within the Coeur d'Alene Basin, Asarco cannot be granted summary judgment for tributaries located <u>within</u> the flood plains of the South Fork and the Coeur d'Alene Rivers.

For these reasons the motion will be granted in part and denied in part.  To the extent Asarco seeks summary judgment on the tributaries in footnote 3 of this Order, and the flood plains of the South Fork and the Coeur d'Alene Rivers, the motion is denied.  The summary judgment is granted as to the remainder of the identified tributaries set forth in Asarco's memorandum (Docket No. 723), statement of material facts (Docket No. 724) and the Declaration of Christopher Pfahl (Docket No. 725).

Defendants also argue the Trustees should be estopped from claiming Defendants are 53% responsible for all costs associated with the clean up and remediation of the Basin.  For the same reasons as discussed earlier, the estoppel argument fails as the Court has not yet had the opportunity to address the legal question of where hazardous substances have come to be located in the Basin and the admissions and stipulations cited by Defendants have been taken out of context.  However, the Court acknowledges that Defendants have raised a valid issue for the Phase 2 trial.

B.  Genuine Issues of Material Fact Exist

Defendants seek partial summary judgment on this issue.  Clearly, there are genuine issues of material fact regarding the transportation of hazardous substances outside the flood plains by the Defendants or other third parties and such disputed material facts do not support limiting liability just to the flood plains of the drainages in which the Defendants operated at this stage of the litigation.  While the Court is not

familiar with the extent of the evidence regarding the exact location of where the co-mingled mine tailings of these Defendants have come to be located, the record is disputed as to whether mine tailings were removed from the flood plains in which these Defendants had mining activities.[4]

The Court acknowledges Mr. Pfahl's expert report which concludes:

With the exception of discrete former mine and mill sites, there is no basis for allocating any past or future response costs, associated with soil removal and/or replacement, incurred outside of the 100 flood plain. . . .[T]hat the EPA has filed to show any connection between elevated metals levels in soils outside the 100 year flood plain and mining activities of Asarco.

In response, the Trustees have filed the affidavits of Fredric Quivik and Mark Murphy.  Quivik states (Docket No. 1396, p. 1):

Asarco, it predecessors, and other mining companies arranged to have coarse tailings transported out of the flood plain of the South Fork Coeur d'Alene River for use in other applications, including for railroad lines, street and road surfacing and concrete aggregate.

The affidavit of Mark Murphy (Docket No. 1392, Ex. F, p. 4) states:

The spatial pattern is illustrated by the more frequent occurrence of elevated lead concentrations (i.e., greater than 1000 mg/kg lead) within driveways and right-of-ways than within other areas sampled.  For example, in the town of Wallace,, 92% of the driveways and right-of-ways contained elevated lead concentrations, while only 55% of yards and 40% of play areas contained elevated lead.  In the town of Osburn, 79% of driveways and 68% of right-of-ways contained elevated lead

---

[4]The Court acknowledges the Trustees do not concede the 100 year floodplain map is the relevant floodplain boundary to be used in this case, however, they have not offered a boundary source other than the 100 year floodplain and they have not established there have been floods of greater magnitude than the 100 year flood standard since mining operations began in the Basin.  The burden will be on the Trustees to establish why the 100 year floodplain maps for the drainages these Defendants operated should not be used as a basis for mapping out one of the  areas where the hazardous substances have come to located.

concentrations, while only 15% of yards and 50% of play areas contained elevated lead.  This pattern is consistent with use of tailings or other mine waste for construction purposes, as documented by Mr. Quivik.

Moreover, Defendant's own expert Dirk Van Zyl concluded historic mine tailings and mixed tailings and sediment "are widely dispersed in the flood plains of the Basin and even outside the flood plains where historic mine and smelter wastes were often used for construction fill for roads and urbanization"[5]   For these reasons, the Court must conclude genuine issues of material fact exist regarding where the Defendants' hazardous substances have come to be located in the Basin and partial summary judgment must be denied.

### C.  Phase 2 Trial

In order to assist the parties in preparing for the Phase 2 trial, the Court will provide the parties with some guidance as to its expectations on this legal and factual issue.  CERCLA mandates that owners and operators of any "facility" are liable for the costs set forth in 42 U.S.C. §  9607 which include but are not limited to costs associated with the removal of hazardous substances and remediation of the resources as well as pay for natural resource damages that have occurred.  The term "facility" is defined very broadly and includes:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise

---

[5]Expert Report of Dirk Van Zyl, dated August 20, 2004, p. 5 attached as Exhibit A to USA's Surreply in Opposition to Asarco's Reply Brief and Hecla's Reply Brief (Docket No. 1427).

MEMORANDUM ORDER - Page 9

come to be located, but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

Because "where" the hazardous substances have come to be located has not been specifically determined by the Court, it will be the Trustees burden to establish in Phase 2 of this trial where in the Basin the hazardous substances of the two remaining Defendants have come to be located. The Court has previously ruled the Trustees do not have to fingerprint the hazardous substance to determine which mining operation it came from. Rather, of the co-mingled hazardous substance from the drainages in which these particular Defendants conducted operations, the Trustees need to establish where the hazardous substances have come to be located.[6] If the Trustees can establish the co-mingled hazardous substances from these two Defendants "came to be located" outside of the flood plains of the drainages in which the Defendants operated, then the Defendants may be liable for the clean up of such hazardous substances.

The Court agrees with the Trustees that the fact that these two Defendants may not have been responsible for transporting the hazardous substance to other locations in the Basin does not relieve them of potential liability under CERCLA. The Court need not find that the Defendants are "arrangers" under 42 U.S.C. § 9607 (a)(3) of CERCLA in order to be held liable for hazardous substance located outside the flood plain. In Catellus Development Corp v. United States, 34 F.3d 748, 752 (9th Cir. 1994), the Ninth

---

[6]By filing the motion for partial summary judgment, the Defendants appear to concede that they can be held liable for damages related to the hazardous substances found within the 100 year floodplain of the drainages this Court has determined they owned or operated.

Circuit specifically held that a party remains responsible for hazardous substances even if the hazardous substance was sold to another party who then disposed of the hazardous substance.  To find otherwise, would allow owners and operators to "'close their eyes' to the methods of disposal of their hazardous substance, a result contrary to the policies underlying CERCLA."  Id.  See also,  Louisana Pacific v. ASARCO, 24 F.3d 1565 (9th Cir. 1994) (defining was is meant by "waste" and "discarded material" for purposes of CERCLA liability).

Based on the broad remedial scope of CERCLA, the Court finds that if an owner or operator who released hazardous substances later allows the removal of such hazardous substances such as mine tailings by a third party (whether or not such tailings are sold to a third party) and such tailings are used instead of gravel for ballast for roads and other urbanization projects, then the owner or operator who originally released or disposed of the hazardous substance into the environment is liable for cleanup of the hazardous substance wherever it has come to be located.  42 U.S.C. §  9607(a)(1) and (2). This is not to say the third party who disposes of such waste is not also liable, rather this case does not involve third party transporters as named defendants.

The Court is not persuaded by Defendants' argument they did not "dispose" of the hazardous substance throughout the Basin.  If Defendants' hazardous substances are proven to be located throughout the Basin by the Trustees, the Defendants will be held liable for disposing of such hazardous substances.  The Defendants released hazardous substances into the environment as owners and operators of certain mining and milling operations when they disposed of or dumped mine tailings into the waterways and that is why they are being held liable in this case.  This Court need not address again the

MEMORANDUM ORDER - Page 11

distinction between a "disposal" and a "release" as a "disposal" is included in the definition of a "release." <u>See</u> September 3, 2003 Order, 280 F. Supp. 2d 1094, 1112. The definition of "disposal" has previously been broadly interpreted by the Ninth Circuit. <u>Id.</u>  Based on this broad definition, the Court has found these Defendants "disposed" of the hazardous substances and it is simply a question of where the hazardous substances have come to be located.

In summary, while Defendants may be liable for hazardous substance outside the 100 year flood plain, the Court nevertheless agrees with Defendants that there needs to be some link established so that these Defendants are not held liable for all hazardous substances located outside the flood plains in which they operated.  Defendants should be held liable for the co-mingled hazardous substances from the drainages in which they operated and the cleaning up associated with such co-mingled hazardous substance wherever that co-mingled hazardous substance has come to be located within the Basin. To the extent that hazardous substance from drainages other than where these Defendants operated has come to be located in the Basin, these Defendants should not be held responsible for another third party's hazardous substance which was not co-mingled with these Defendants' hazardous substances.  However, based on the remedial nature of CERCLA, if these Defendants' mine waste has become further co-mingled with the hazardous substances of other mining companies from other drainages, the Defendants may still be on the hook for the costs associated with clean up and remediation as it may not be possible to differentiate the co-mingled hazardous substances of one mining company from another.

MEMORANDUM ORDER - Page 12

In making this ruling, the Court does not mean to require the Trustees to prove the path of each pound or ton of hazardous substance released in the mining process. Plaintiffs' burden is to establish that mining tailings from the drainages in which the Defendants operated were transported away from such drainages to other locations in the Basin and used for road fill and surfacing materials.  The Trustees will also have to establish that the transportation of the hazardous substances more likely than not led to the contamination of the of yards, playgrounds, etc. they seek to hold these Defendants liable for cleaning up and remediating.

<strong>Motions to Strike Declarations and Expert Reports</strong>

The Trustees move to strike the expert report of Chris Pfahl and the Defendants have moved to strike the declarations of Mr. Quivik and Mr. Murphy.  Based on the Court's ruling on the motion for partial summary judgment, the expert opinions of these three gentlemen as well as others will be extremely relevant to the factual findings and liability determinations to be made by the Court in Phase 2 of this trial.  The Court is going to deny the motions to strike and allow the experts to supplement their expert reports within thirty (30) days of the date of this Order based on the Court's guidance of what evidence needs to be established regarding the source and location of hazardous substances in the Basin.

<strong>ORDER</strong>

Being fully advised in the premises, the Court hereby orders:

1) Defendants' Motion for Partial Summary Judgment (Docket No. 1365) is DENIED.

MEMORANDUM ORDER - Page 13

2) Motion to Strike Expert Report of Chris Pfahl (Docket No. 1356) previously denied without prejudice in the Court's March 31, 2005 Order (Docket No. 1460) is now DENIED with prejudice.

3) Motion to Strike Declarations of Murphy and Quivik (Docket No. 1401) is DENIED.

DATED:  **July 11, 2005**

Honorable Edward J. Lodge
U. S. District Judge

MEMORANDUM ORDER - Page 14